# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**SHAWN SOWELL,**

     **Petitioner,**

                           **CASE NO. 2:09-CV-1089**

                           **JUDGE JAMES L. GRAHAM**

**v.**                         **MAGISTRATE JUDGE E.A. Preston Deavers**

**MICHAEL SHEETS, WARDEN,**

     **Respondent.**

## REPORT AND RECOMMENDATION

Petitioner, a state prisoner, brings the instant Petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. This matter is before the Court on the instant Petition, Respondent's Return of Writ, Petitioner's Reply, and the exhibits of the parties. For the reasons that follow, the Magistrate Judge **RECOMMENDS** that this action be **DISMISSED**.

## FACTS and PROCEDURAL HISTORY

The Ohio Tenth District Court of Appeals summarized the facts and procedural history of this case as follows:

> Appellant was indicted on one count of aggravated murder, in violation of R.C. 2903.01, with a firearm specification. Appellant pled not guilty and the case was tried to a jury. Appellee presented the following evidence.
>
> Ahman Fares testified on behalf of appellee as follows. Fares worked as a cashier at Kelly's Carryout located at 1521 North 4th Street ("4th") at the corner of 11 th Avenue ("11th") in Columbus, Ohio. On the evening of April 18, 2005, he was standing outside the front door of the carryout talking to Jimon Jones. An SUV pulled up directly across the street from the carryout and stopped. Neither Fares nor Jones recognized the SUV; they noticed it only because it had distinctive wheel rims.
>
> A man who had been standing on the sidewalk across the street from

the carryout approached the passenger side of the SUV and conversed with the occupants for approximately 30 seconds. The SUV then pulled away and turned right onto 11th; the man crossed the street and walked toward the carryout. According to Fares, Jones did not appear to recognize the man, and said nothing about him as the man approached the carryout. Thereafter, Fares, presuming the man to be a potential customer, entered the carryout and stood behind the counter, which Fares estimated to be "maybe 15 feet at the most" from the front door. (Tr. 420.)

The man, whom Fares had never seen before, then entered the carryout, approached the counter, purchased a cigar, and walked toward the door. At the same time, Jones entered the carryout. According to Fares, Jones again did not appear to recognize the man, and the two did not communicate in any way as they passed one another. As Fares turned away from the door, he heard several gunshots. He ducked behind the counter and heard two more gunshots. Thereafter, he looked up and saw Jones lying on the floor. Although Fares did not actually see who fired the shots, he saw "someone" with a gun, and was "pretty sure" it was the man who purchased the cigar, because "nobody else came into the store" and "it happened too fast for it to be anybody else." (Tr. 422.) He then observed the man run down a nearby alley.

Fares immediately called 911; police and emergency medical personnel arrived shortly thereafter. Fares told the police that the man who purchased the cigar was a dark-skinned African-American, 5' 11" to 6', with a full beard, wearing dark pants and a green shirt with a yellow picture on the front of it. At trial, Fares described the man's beard as "full," i.e., "covering his entire face * * * not like a goatee." (Tr. 427.) Two days after the shooting, the police showed Fares two separate photo arrays, both of which included a photograph of appellant, and asked him if he could identify the person who shot Jones. Fares could not identify the shooter from either of the arrays.

At trial, Fares admitted that the man who purchased the cigar stood close to him during the transaction; indeed, he testified he was "face-to-face" with the man. (Tr. 427.) However, he did not pay particularly close attention to the man because he was just "another customer" (Tr. 425); in addition, he had to turn away from the man in order to retrieve the cigar from under the counter. When presented with the photo arrays at trial, he could not identify the man who purchased the cigar from him. Indeed, he testified that the man in the carryout did not resemble any of the photographs in either of the

arrays. Fares testified that he probably would not be able to recognize the man if he saw him again because the incident happened so quickly and the man had a full beard which covered most of his face.

On cross-examination, Fares admitted that he paid at least "some attention" to the man as he processed the cigar purchase; as such, he "had him in [his] view for at least a reasonable period of time." (Tr. 447.) He described the man's beard as "very obvious," i.e., two to three inches long around his entire face. (Tr. 455)

Columbus Police Officer John Haley testified on behalf of appellee as follows. Officer Haley arrived at the carryout shortly after receiving a radio dispatch about the shooting. Upon arrival, he observed a group of individuals standing across the street from the carryout. He then interviewed Fares, who provided a description of a man who had been in the store immediately prior to the shooting.

On cross-examination, Officer Haley testified that he arrived at the carryout "within a minute" after receiving the radio dispatch. (Tr. 479.) In addition to the group of people he observed standing across the street from the carryout, he also observed a group of individuals running in that general direction; he did not, however, interview any of those persons. On redirect, Officer Haley testified that it is not unusual to encounter a large group of people at the scene of a shooting.

Crime Scene Search Unit ("CSSU") Detective Phillip Walden testified on behalf of appellee as follows. CSSU collected, among other items, seven spent shell casings just inside the door of the carryout. CSSU did not collect DNA evidence from the counter or any articles on or near the counter, as the information provided about the shooting indicated that no physical confrontation other than the shooting of the victim had transpired; hence, there would likely be no DNA evidence at the scene other than the victim's blood. Detective Walden also testified that CSSU did not recover any fingerprints of value from either the counter or the SUV.

On cross-examination, Detective Walden admitted that DNA evidence, if present, can be obtained from "almost any surface." (Tr. 545.) He further testified that CSSU did not dust the door or doorframe for fingerprints because the information provided about the shooting indicated that the door remained open throughout the entire incident.

The driver of the SUV, Anthony Crump, testified on behalf of appellee as follows. On the evening of April 18, 2005, he and his cousin, Andre Brown, were riding around smoking marijuana. Enroute to purchase more marijuana from a friend on 11th, Crump drove northbound on 4th, stopping twice along the way. Crump first stopped near Ninth Avenue; he then continued northbound on 4th and stopped in front of an apartment building at 1504 North 4th, "a little before" 11th. (Tr. 592, 594.) He spoke to some people at each of the stops, including a man named "Shawn" (Tr. 595), whom he had known "slightly" from "out in the neighborhood" for approximately ten years. (Tr. 583.) At first, Crump was "not all the way sure" at which of the two stops he spoke to Shawn. (Tr. 595.) However, after reviewing a videotape of his interview with police the night of the shooting, he testified that he stopped and "talked to a few people" including Shawn while driving on 4th (Tr. 600) and that he spoke to Shawn near a house "right across from the market." (Tr. 601.) He identified appellant as the "Shawn" with whom he conversed during the second stop.

Crump further testified that following the conversation with appellant, he drove northbound on 4th and turned right onto 11th; he had "no idea" what happened to appellant after he drove away. (Tr. 602.) Crump continued on 11th for two blocks; he stopped on the side of the street to purchase more marijuana. As he exited his vehicle, he heard shots fired "in the neighborhood." (Tr. 605.) He completed the marijuana purchase, returned to the SUV, drove Brown home, and then went to a bar. Sometime after he left the bar, the police stopped him; they later questioned him and seized his SUV.

On cross-examination, Crump testified that he was "high" the night of April 18, 2005 because he had smoked several marijuana "blunts," some of which were laced with cocaine. (Tr. 625-626, 628, 630, 635, 662.) During his testimony, he suddenly recalled that a man named "Little C" was also in the SUV with him and Brown. Crump assumed "Little C" was "young," somewhere "between 18 and 22," because he "[did] not have a mustache like [Crump's]." (Tr. 628.) He admitted that he had never mentioned "Little C" to the police.

Crump further testified that he stopped somewhat south of the carryout, not directly across from it, and that there were several people outside when he stopped, including appellant. He also averred he told the police that appellant approached the SUV from the middle of the street because he was scared after police told him they believed he and Brown were involved in the murder. He admitted, however,

that he could not recall if appellant was in the street or on the sidewalk.

Crump also testified that police told him during the interview that he and Brown were both implicated in the crime, i.e., that even if they did not do it, they had either provided the shooter with the gun or gave him the "A[-]ok" to shoot Jones (Tr. 645); accordingly, he was scared and thus tried "to satisfy" the police by telling them anything he thought they wanted to hear. (Tr. 646, 659.) He also testified that he was "high" that night and was "not one hundred percent sure" about anything he told the police. (Tr. 643-644.)

Crump further averred he did not describe appellant to the police; rather, he essentially adopted the description police provided to him, i.e., a male black with a beard, dressed in a dark shirt with a yellow image on the front of it. However, at trial, he could not recall if appellant had a beard on the night of the shooting. He further testified that appellant did not have a gun, that he had never seen appellant with a "real" or "full" beard (Tr. 648), and that he did not witness the shooting.

On redirect, the prosecution showed Crump a slightly larger version of the photograph that was included in the first photo array shown to Fares ("State's Exhibit 1") on April 20, 2005. Crump identified the photograph as one of appellant and noted that appellant had what "look[ed] like a beard that was "not that long." (Tr. 678.) Crump admitted he had never seen appellant wear such a beard.

Lead homicide Detective James Porter testified on behalf of the state as follows. Detective Porter corroborated Detective Walden's testimony regarding the processing of the crime scene. He further testified that he interviewed Crump, whom he described as "evasive," but not "high" during the interview. (Tr. 708.) Based upon the information provided by Crump, Detective Porter assembled two separate photo arrays, each including a different picture of appellant. Detective Porter corroborated Fares' testimony that he was unable to positively identify appellant from either of the arrays as the man who shot Jones.

Approximately one month after the murder, Detective Porter interviewed Brown, who provided information which led Detective Porter to file a warrant for appellant's arrest. Appellant turned himself in to the police two days after the warrant was issued.

According to Detective Porter, appellant had a "light beard and mustache" at the time. (Tr. 717.)

On cross-examination, Detective Porter testified that he mentioned during the interview with Crump that he had certain information which suggested that the person who committed the murder resembled Brown. Detective Porter further testified that Crump did not mention "Little C" during the interview. Detective Porter identified "Defendant's Exhibit A" as a slate card photograph of appellant taken May 19, 2005, the day appellant turned himself in to the police.

On redirect, Detective Porter described Brown as approximately 5' 7" with a "thick build." (Tr. 734.) On recross, Detective Porter admitted that he never obtained a physical description of "Little C."

Joshua Zachrich, appellee's final witness, testified as follows. Zachrich is employed by a company that provides inmate telephone systems to prisons and jails, including the Franklin County Jail. The system permits inmates to make outgoing telephone calls, which are tracked via pin number to the particular inmate who initiated the call. At the start of each call, both the inmate and call recipient are informed that the call is being monitored and recorded.

Prior to trial, at the prosecutor's request, Zachrich retrieved two sets of telephone calls appellant made during his pre-trial incarceration in the Franklin County Jail. The first set encompassed calls placed between May 20, 2005 and May 30, 2005; the second set included calls made between July 13, 2005 and July 26, 2005. Zachrich provided a recording of the calls to the prosecutor on a compact disc ("CD"). Over appellant's objection, appellee played the CD ("State's Exhibit J-1 a") for the jury. We will set forth more detail about these telephone calls in our discussion of appellant's third assignment of error.

Following Zachrich's testimony, appellee rested. Appellant did not testify and did not call any witnesses. He submitted only "Defendant's Exhibit A," his May 19, 2005 slate card photograph, as evidence. The trial court then granted appellant's Crim.R. 29 motion to dismiss the allegation that appellant committed the offense with prior calculation and design. Accordingly, the trial court charged the jury on the offense of murder, in violation of R.C. 2903.02, with a firearm specification. The jury found appellant guilty of murder, with a firearm specification, and the trial court sentenced him accordingly.

*State v. Sowell*, No. 06AP-443, 2008 WL 2600222, at *1-5 (Ohio App. 10th Dist. June 30, 2008).

Petitioner filed a timely appeal in which he raised the following assignments of error:

> ASSIGNMENT OF ERROR NO. I:
>
> THE TRIAL COURT COMMITTED STRUCTURAL ERROR
> WHEN IT PERMITTED A PERSON TO BE THROWN [OUT] OF
> THE COURTROOM WITHOUT A HEARING OR EVIDENCE OF
> DISRUPTION AND WHEN IT BARRED A PERSON FROM THE
> COURTROOM AND COURTHOUSE FOR THE REMAINDER OF
> THE TRIAL. THESE ORDERS VIOLATED SHAWN SOWELL'S
> RIGHT TO A PUBLIC TRIAL AS GUARANTEED BY THE
> FIRST, FIFTH, SIXTH AND FOURTEENTH AMENDMENTS TO
> THE CONSTITUTION AND ARTICLE I, §§ 2, 10 AND 16 OF
> THE OHIO CONSTITUTION.
>
> ASSIGNMENT OF ERROR NO. II:
>
> THE REPRESENTATION PROVIDED TO SHAWN SOWELL
> FELL FAR BELOW THE PREVAILING NORMS FOR COUNSEL
> IN A CRIMINAL CASE, WAS UNREASONABLE, AND
> AFFECTED THE OUTCOME IN VIOLATION OF THE FIFTH,
> SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS AS
> WELL AS ART. I, § [§ ]2, 9, 10, AND 16 OF THE OHIO
> CONSTITUTION.
>
> ASSIGNMENT OF ERROR NO. III:
>
> THE ADMISSION OF PORTIONS OF JAIL CALLS HAD LITTLE
> IF ANY RELEVANCE, DID NOT INDICATE CONSCIOUSNESS
> OF GUILT AS ARGUED BY THE PROSECUTOR AND WERE
> MORE PREJUDICIAL THAN PROBATIVE, DENYING SOWELL
> HIS RIGHTS AS GUARANTEED BY THE FIFTH, SIXTH, AND
> FOURTEENTH AMENDMENTS TO THE UNITED STATES
> CONSTITUTION AND ARTICLE I, §§ 2, 10, AND 16 OF THE
> OHIO CONSTITUTION.
>
> ASSIGNMENT OF ERROR NO. IV:
>
> SOWELL'S CONVICTION IS BASED ON EVIDENCE THAT IS
> INSUFFICIENT AS A MATTER OF LAW. IN ADDITION, THE
> CONVICTIONS ARE AGAINST THE MANIFEST WEIGHT OF
> THE EVIDENCE.

*Id*. at *5. On June 30, 2008, the state appellate court affirmed the trial court's judgment. On December 3, 2008, the Ohio Supreme Court dismissed Petitioner's subsequent appeal. *State v. Sowell*, 120 Ohio St.3d 1421 (2008).

Petitioner also pursued post conviction relief.

> [O]n April 2, 2007, appellant filed his petition for postconviction relief. Therein, he asserted five claims: (1) ineffective assistance of counsel for failing to object to the ejection of certain spectators from the courtroom; (2) ineffective assistance of counsel for failing to request to voir dire the jury after a spectator allegedly threatened a witness; (3) void conviction due to the jury being fearful of appellant; (4) void conviction because the trial court failed to voir dire the jury; and (5) ineffective assistance of counsel for failing to call witnesses to assert an alibi. In support of his petition, appellant attached the affidavits of Joseph Sowell, Stephan Sowell, Muhammed Diab, and Tia Conley.
>
> By judgment entry journalized September 5, 2007, the trial court made findings of fact and conclusions of law and dismissed appellant's petition without a hearing. The court dismissed appellant's first four claims as barred by res judicata and on their merits, and it dismissed his fifth claim on the merits.

*State v. Sowell,* No.07AP-809, 2008 WL 852601, at *2 (Ohio App. 10th Dist. March 31, 2008).

Petitioner filed a timely appeal in which he raised the following claims:

> ASSIGNMENT OF ERROR I
>
> THE TRIAL COURT ERRED IN DISMISSING CLAIM ONE OF SOWELL'S POST-CONVICTION PETITION WHERE SUFFICIENT OPERATIVE FACTS WERE PRESENTED TO MERIT RELIEF OR, AT LEAST WARRANT, AN EVIDENTIARY HEARING.
>
> ASSIGNMENT OF ERROR II
>
> THE TRIAL COURT ERRED IN DISMISSING CLAIM TWO OF SOWELL'S POST-CONVICTION PETITION WHERE SUFFICIENT OPERATIVE FACTS WERE PRESENTED TO MERIT RELIEF OR, AT LEAST WARRANT, AN EVIDENTIARY

HEARING.

ASSIGNMENT OF ERROR III

THE TRIAL COURT ERRED IN DISMISSING CLAIMS THREE AND FOUR OF SOWELL'S POST-CONVICTION PETITION WHERE SUFFICIENT OPERATIVE FACTS WERE PRESENTED TO MERIT RELIEF OR, AT LEAST WARRANT, AN EVIDENTIARY HEARING.

ASSIGNMENT OF ERROR IV

THE TRIAL COURT ERRED IN DISMISSING CLAIM FIVE OF SOWELL'S POST-CONVICTION PETITION WHERE SUFFICIENT OPERATIVE FACTS WERE PRESENTED TO MERIT RELIEF OR, AT LEAST WARRANT, AN EVIDENTIARY HEARING.

*Id.* at *3. On March 31, 2008, the appellate court affirmed the trial court's judgment. *Id.* On August 6, 2008, the Ohio Supreme Court dismissed Petitioner's subsequent appeal. *State v. Sowell*, 119 Ohio St.3d 1414 (2008).

On November 30, 2009, Petitioner filed the instant Petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. He alleges that he is in the custody of the Respondent in violation of the Constitution based upon the following grounds:

1.  Shawn Sowell's right to a public trial as guaranteed by the First, Fifth, Sixth and Fourteenth Amendments to the United States Constitution is violated when the trial court barred Stefan Sowell from the courtroom without a hearing or evidence of disruption. The state court resolution of this ground was an unreasonable application of or contrary to United States Supreme Court precedent.

2.  The failure of counsel to :(a) move to replace a juror that indicated she was fearful of the defendant; (b) contest the removal of Stefan Sowell, Petitioner's brother, from the courtroom without a hearing; (d) contest the removal of a Sowell family friend who wiped sweat from his face from the courtroom without a hearing; (e) request the trial court to voir

dire the jury after a spectator allegedly threatened a witness; (f) present available witnesses that offered exculpatory alibi evidence relating to Petitioner's actions; (g) present available witness that offered evidence of Petitioner's incapability or at a minimum, extremely diminished capacity to murder the victim, constitutes ineffective assistance of counsel under the Sixth and Fourteenth Amendments to the United States Constitution. The state court resolution of this ground was an unreasonable application of or contrary to United States Supreme Court precedent.

3.      Petitioner was denied his right to a fair trial as guaranteed by the fifth, Sixth, and Fourteenth Amendments to the United States Constitution when the prosecution was permitted to play before the jury out-of-context excerpts of recordings instead of the entire conversation. The state court resolution of this ground was an unreasonable application of or contrary to United States Supreme Court precedent.

4.      Petitioner's Fourteenth Amendment right to Due Process was violated because his conviction for murder is based on insufficient evidence. The state court resolution of this ground was an unreasonable application of or contrary to United States Supreme Court precedent.

5.      Petitioner was denied due process and a fair trial because his conviction was rendered by a fearful non-impartial jury. The state court resolution of this ground was an unreasonable application of or contrary to United States Supreme Court precedent.

6.      The trial court failed to convey impartiality and failed to voir dire the jury to determine if they were affected in any manner by alleged gestures by spectators, or action or comments made by deputy sheriffs present in the courtroom and in the area outside the courtroom during the trial in violation of Sowell's rights to: (1) substantive due process and other unenumerated rights as guaranteed by the Ninth Amendment; (2) the due process and equal protection clauses of the Fourteenth Amendment; (3) the right to effective assistance of counsel guaranteed by the Sixth Amendment; (4) the right to a fair and impartial jury guaranteed by the Fifth and Fourteenth Amendments; (5) the right to a fair and impartial tribunal guaranteed by the Fifth and Fourteenth Amendments;

and (6) guarantees of procedural and substantive due process protected by the fifth Amendment. The state court resolution of this ground was an unreasonable application of or contrary to United States Court precedent.

It is the position of the Respondent that Petitioner's claims are without merit.

## CLAIM ONE

In claim one, Petitioner asserts that he was denied his right to a public trial because the trial court barred his brother from the proceedings in violation of *Waller v. Georgia*, 467 U.S. 39, 46 (1984). The state appellate court rejected this claim as follows:

Appellant asserts in his first assignment of error that the trial court committed structural error when it approved a courtroom deputy's removal of a member of appellant's family from the courtroom, and then issued its own order barring that family member from the courtroom and the courthouse for the remainder of the trial. Appellant contends the trial court's order violated his right to a public trial as guaranteed by the First, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Sections 2, 10, and 16, Article I, Ohio Constitution. We disagree.

During a recess taken in Crump's testimony, the prosecutor, outside the presence of the jury, notified the trial court that a courtroom deputy had informed him that while Crump was testifying, a person believed to be a member of appellant's family made a threatening gesture toward Crump, *i.e.*, he pointed toward Crump "with both fingers simulating like he had a weapon in his hand" (Tr. 598) and that the deputy had removed that person from the courtroom. Immediately thereafter, the trial court averred that "[t]hat family member will not be permitted back into this courtroom for the balance of the trial or at any time relative to these proceedings of the trial." (Tr. 599.)

Defense counsel responded, "[o]bviously, [the prosecutor] and I, neither one of us were aware of any of this going on until just when we came back in, and I have not talked to [the deputy] myself, but I am cautioning my people-." *Id.* The trial court cautioned that "[a]nybody making any kind of gestures or anything like that or anything construed in that way, that person will be removed from the courthouse, not only from the courtroom, but from the courthouse. So

anybody who is in here and wants to do that, bear that in mind." *Id*. Following this admonition, trial resumed; no further expulsions occurred.

Appellant argues that the trial court erred in excluding his family member from the trial based solely upon the hearsay representation of the prosecutor. Appellant maintains that the court should have investigated the matter further, *i.e.*, held a hearing and questioned both the deputy and the family member, in order to substantiate the prosecutor's claim. Appellant further asserts that the trial court should have determined whether the jury was aware of the incident and, if so, whether it affected its deliberations. Appellant further contends the trial court erred in failing to consider any alternatives to excluding the family member from the remainder of the trial. In addition, appellant asserts the trial court erred in failing to enter any factual findings on the record to support its decision. Appellant avers the trial court's error was structural, mandating reversal of his conviction without a demonstration of prejudice.

The Sixth Amendment to the United States Constitution, as applied to the states through the Fourteenth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial." Section 10, Article I, Ohio Constitution also guarantees an accused the right to a public trial. Historically, the right to a public trial has been recognized as a safeguard against possible infringements against the accused. *State v. Grant*, Cuyahoga App. No. 87556, 2007-Ohio-1460, at ¶ 12. "An open courtroom is necessary to preserve and support the fair administration of justice because it encourages witnesses to come forward and be heard by the public, discourages perjury by the witnesses, and ensures that the judge and prosecutor will carry out their duties properly." *Id.*, citing *State v. Lane* (1979), 60 Ohio St.2d 112, 119, 397 N.E.2d 1338, and *Waller v. Georgia* (1984), 467 U.S. 39, 104 S.Ct. 2210, 81 L.Ed.2d 31. Further, a public trial permits the general public to observe that the accused is " 'fairly dealt with and not unjustly condemned, and that the presence of the interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions.' " *Id.*, quoting *Waller* at 43. The public's right to attend criminal trials is also implicit within the guarantees of the First Amendment. *State v. Morris,* 157 Ohio App.3d 395, 398, 811 N.E.2d 577, citing *State ex rel. The Repository, Div. of Thompson Newspapers, Inc. v. Unger* (1986), 28 Ohio St.3d 418, 420, 504 N.E.2d 37.

"The violation of the right to a public trial is considered structural error and not subject to harmless-error standard." *State v. Drummond*, 111 Ohio St.3d 14, 854 N.E.2d 1038, 2006-Ohio-5084, at ¶ 50, citing *Waller, supra,* at 49-50, fn. 9. "A structural error is a 'defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself.'" *Id.*, citing *Arizona v. Fulminante* (1991), 499 U.S. 279, 310, 111 S.Ct. 1246, 113 L.Ed.2d 302.

However, " 'the right to a public trial is not absolute and an order barring spectators from observing a portion of an otherwise public trial does not necessarily introduce error of constitutional dimension.'" *State v. Bragg*, Franklin App. No. 05AP100, 2006-Ohio-1903, ¶ 24, quoting *State v. Whitaker*, Cuyahoga App. No. 83824, 2004-Ohio-5016, ¶ 11. A trial court has the authority to exercise control over the proceedings and may exclude those courtroom spectators whose conduct is likely to interfere with the administration of justice or to denigrate the protection of public health, safety, and morals. *Grant,* at ¶ 13, citing *Drummond*. "A trial court's decision to remove spectators from a courtroom is reviewed under an abuse of discretion standard." *Bragg, supra*, citing *State v. Brown* (Nov. 25, 1998), Cuyahoga App. No. 73060.

In *Waller, supra*, the seminal case regarding the public trial guarantee, the trial court, over the defendant's objection, closed a suppression hearing to all persons other than witnesses, court personnel, the parties, and counsel. The Supreme Court of the United States set forth the following four-prong test to determine the need for a courtroom closure: first, the party seeking to close the trial or some portion of it must advance an overriding interest that is likely to be prejudiced; second, the closure must be no broader than necessary to protect that interest; third, the trial court must consider reasonable alternatives to closing the courtroom; and fourth, the court must make findings adequate to support the closure. *Id.* at 48.

Initially, we must first consider appellee's contention that appellant waived his right to a public trial by failing to object to the trial court's removal order. There is some authority for appellee's position. *See Drummond, supra*, at ¶ 59 ("counsel's failure to object to the closing of the courtroom constitutes a waiver of the right to a public trial * * * "). *See, also, Whitaker, supra*, at ¶ 13, citing *Peretz v. United States* (1991), 501 U.S. 923, 111 S.Ct. 2661, 115 L.Ed.2d 808 ("Failure to object to closing of the courtroom constitutes a waiver of the right to a public trial."). However, the Supreme Court of Ohio has more recently held that the right to a public trial cannot

be waived by silence. *See State v. Bethel*, 110 Ohio St.3d 416, 854 N.E.2d 150, 2006-Ohio-4853, at ¶ 81 ("Although Bethel did not object to the closing of the hearing, the right to a public trial under Section 10, Article I of the Ohio Constitution cannot be waived by the defendant's silence."). Therefore, appellant did not waive his right to a public trial by his failure to object. *Id*. Accordingly, we turn to the merits of appellant's argument.

Citing *Shepard v. Artuz* (S.D.N.Y.2000), 99 Civ.1912 (DC) and *United States v. Perry* (C.A.D.C., 2007), 479 F.3d 885, appellee urges that *Waller* does not apply to partial courtroom closures and, as such, the trial court was not required to engage in the *Waller* four-part closed-courtroom analysis. We agree.

In *Shepard*, a court officer reported to the trial court during the defendant's state court trial that he observed a woman whom he believed to be the defendant's mother making "threatening gestures," *i.e.*, making fists and slashing motions across her throat, toward a witness during her testimony. The trial court did not ask the witness if she observed the gestures; rather, the court instructed court officers to bring the woman into the courtroom for questioning. The woman acknowledged she was "related" to the defendant but denied that she made the gestures. The trial court overruled an immediate defense motion for a mistrial, noting that two potential prosecution witnesses had been murdered prior to the trial.

Following affirmance of his conviction, the defendant sought federal habeas corpus relief, arguing that the exclusion of his mother from the courtroom violated his Sixth Amendment right to a public trial. The district court noted that a defendant's right to a public trial " 'has always been interpreted as being subject to the trial judge's power to keep order in the courtroom.'" *Id.*, quoting *Cosentino v. Kelly*, 102 F.3d 71, 73 (2d Cir. 1996), quoting *United States ex rel. Orlando v. Fay*, 350 F.2d 967, 971 (2d Cir. 1965). The court further averred that " '[i]t is essential to the proper administration of criminal justice that dignity, order, and decorum be the hallmarks of all court proceedings in our country. The flagrant disregard in the courtroom of elementary standards of proper conduct should not and cannot be tolerated.'" *Shepard, supra,* quoting *Illinois v. Allen* (1970), 397 U.S. 337, 343, 90 S.Ct. 1057, 25 L.Ed.2d 353. Further, the court stated that a trial court may exclude disorderly spectators after " 'balanc[ing] between the requirement that the actions of the courts be open to public scrutiny and the need to have the trial proceed in an orderly manner.'" *Shepard*, quoting *Fay, supra*, at 971.

The district court then addressed the defendant's assertion that under *Waller*, the trial court, prior to removing the defendant's mother from the courtroom, should have asked the witness whether she was intimidated by the mother's actions. The court rejected the defendant's argument, holding that *Waller* "governs the closing of the courtroom to peaceable individuals or to the public at large." *Shepard*, quoting *Cosentino, supra,* at 73. The court held that "[w]hen the exclusion is based on the actual misconduct of a spectator in open court, however, then the *Waller* test does not apply." *Shepard*, citing *Cosentino*. The court concluded that under the circumstances before it, where the record clearly established that the trial court excluded the defendant's mother from the courtroom to allow the trial to proceed in an orderly fashion, a reviewing court need not separately consider the *Waller* factors. *Id.*

In *Perry, supra*, the court employed a "triviality standard," not the *Waller test*, in a case where the trial court excluded the defendant's eight-year old son from the trial. During opening statements, the defendant's wife brought the child with her into the courtroom. The trial court suggested that the wife remove the child to prevent him from witnessing his father's trial. After a recess, the trial court averred that it had been notified that the defendant had instructed his wife to keep the child in court. The trial court, surmising that defendant urged the child's attendance solely to evoke sympathy from the jury, ordered the wife to remove the child from the courtroom. Upon defendant's protestation that his wife was his "support system," the trial court averred that the wife could return without the child. The wife apparently missed the first day of the defendant's three-day trial.

On appeal, the defendant contended that the reasons advanced by the court for its actions-to protect the child's welfare and to prevent the defendant from using the child to evoke juror sympathy-did not justify denying him his right to a public trial. The defendant further maintained that he objected to the removal and thus was entitled to harmless error review.

The court of appeals noted that both the defendant and the government had analyzed the issue under the four-part test developed in *Waller*. However, the court determined that the *Waller* test applies only if closing the courtroom implicates the accused's Sixth Amendment right. *Id.* at 889, citing *United States v. Ivester*, 316 F.3d 995, 958 (9th Cir. 2003). While the court acknowledged the "special concern" for assuring the attendance of an accused's family

members, *Perry* at 890, citing *In re Oliver* (1948), 333 U.S. 257, 68 S.Ct. 449, the court further noted that some circuit courts "have recognized that there are certain instances in which [an] exclusion cannot be characterized properly as implicating the constitutional guarantee." *Perry*, quoting *Braun v. Powell*, 227 F.3d 908, 918. Quoting *Peterson v. Williams,* 85 F.3d 39 (2d Cir. 1996), the *Perry* court noted that "[e]ven a problematic courtroom closing can be 'too trivial to amount to a violation of the [Sixth] Amendment." The court explained the "triviality standard" as follows:

> A triviality standard, properly understood, does not dismiss a defendant's claim on the grounds that the defendant was guilty anyway or that he did not suffer 'prejudice' or 'specific injury.' It is, in other words, very different from a harmless error inquiry. It looks, rather, to whether the actions of the court and the effect that they had on the conduct of the trial deprived the defendant-whether otherwise innocent or guilty-of the protections conferred by the Sixth Amendment.

*Id.*, quoting *Peterson* at 42.

The *Perry* court stated that "[a] courtroom closing is 'trivial' if it does not implicate the 'values served by the Sixth Amendment' as set forth in *Waller." Id.* The court further averred that " '[e]ven the exclusion of a family member or friend may, in rare circumstances * * *, not implicate the Sixth Amendment public trial guarantee.'" *Id.*, quoting *Carson v. Fischer,* 421 F.3d 83, 93 (2d Cir. 2005). Applying the "triviality standard," the court concluded that the trial court's action did not violate the Sixth Amendment because the trial remained open to the public, including defendant's wife, the child was the only person excluded from the proceedings, and the child's presence in the courtroom would not serve the purposes of the right to public trial, *i.e.*, ensuring that the judge and prosecutor carry out their duties responsibly, discouraging perjury, or encouraging witnesses to come forward. *Perry*.

Although we are not bound by these federal court decisions, we find these authorities to be persuasive. *Shepard* is particularly applicable to the instant case, in that it, too, involved exclusion of an accused's relative from a courtroom following an assertion by a court officer that the relative had made threatening gestures toward a witness while the witness testified. We agree with the holding in *Shepard* that

when the exclusion is based on misconduct by the spectator, the *Waller* test does not apply. Moreover, none of the cases cited by appellant involved the exclusion of a single spectator based upon that spectator's misconduct in open court.

Further, the *Shepard* holding is based upon sound reasoning that is applicable here. As the court noted, *Waller* involved closure of a courtroom to "peaceable individuals" and the "public at large." It did not address a situation where one unruly spectator is expelled for engaging in improper, menacing conduct and the "public at large" and other "peaceable individuals" are permitted to remain. Further, the purposes of the right to public trial, *i.e.*, ensuring that the judge and prosecutor perform their duties responsibly, discouraging perjury, or encouraging witnesses to come forward, so essential to the *Waller* court's analysis, are not abridged where, as here, the trial remains open to the public, including the media, and the only person excluded from the proceedings is the disruptive spectator.

*Perry* also supports the conclusion that the *Waller* test is inapplicable under these circumstances. As previously noted, the *Perry* court stated that the exclusion of an accused's family member may not, under certain circumstances, implicate the Sixth Amendment public trial guarantee. We believe that the "rare circumstances" to which the Perry court alludes encompass a situation where a family member makes threatening gestures toward a witness in open court, especially where the disruptive spectator was the only person excluded from the proceedings, and the trial remained open to the public, including other family members of the accused and the media.

Thus, in accord with *Shepard* and *Perry,* we hold that when the record clearly establishes that a trial court, after balancing the need for an open, public trial with the orderly administration of justice, excludes a spectator who engages in misconduct in open court, a reviewing court need not separately consider the four-part *Waller* test. As in *Shepard,* the record here establishes that the trial court's exclusion was based on misconduct of a spectator in open court; as such, we need not separately consider the *Waller* criteria.

Moreover, we find that the trial court's interest in maintaining courtroom security and protecting witness safety supported the trial court's ejection of the offending spectator. As noted, the prosecutor informed the court that the courtroom deputy had reported that defendant's family member made a threatening gesture toward Crump during his testimony. The trial court is certainly entitled to

rely upon the assertions of court officers such as the prosecutor and deputy sheriff. Further, defense counsel's response suggests that he did not doubt the prosecutor's assertion; indeed, although defense counsel admitted that he did not see the gesture and had not spoken to the deputy, he nonetheless stated that he had "cautioned [his] people." We presume defense counsel meant that he had cautioned those courtroom observers associated with defendant to refrain from exhibiting similar behavior. Defense counsel's admonishment suggests that he considered the matter to be extremely serious, thereby justifying the trial court's decision to ratify the deputy's removal of appellant's family member.

While we acknowledge the "special concern" for permitting a defendant's family member to attend a trial, *see Drummond, supra*, at ¶ 56, 854 N.E.2d 1038, citing *Oliver, supra*, that special concern is overridden by the family member's misconduct. The trial court did not issue a blanket closure of the courtroom, but instead ordered only the removal of the person who made the threatening gesture. Although the trial court admonished the remaining spectators, it did not expel them from the courtroom.

In addition, the general public and the media viewed the trial. As noted in *Drummond,* the presence of the media helps safeguard an accused's right to a public trial. *Id.* at ¶ 55, 854 N.E.2d 1038. Further, the transcript of the trial became a public record. *Id.*; *Grant,* at ¶ 17.

Contrary to appellant's intimation, a trial court is not required to hold an evidentiary hearing before deciding courtroom closure issues. *United States v. Sherlock* (C.A.9, 1992), 962 F.2d 1349, 1358. We particularly find a hearing unnecessary where, as here, a court officer reports that a spectator made a threatening gesture toward a testifying witness during open court. Furthermore, appellant cites no authority, and we have found none, requiring a trial court to *voir dire* the jury in order to ascertain whether it observed the offending conduct or whether that conduct affected its deliberations.

In conclusion, we find that there was a substantial reason for the very limited, narrowly tailored courtroom closure. Where, as here, there is an interest in maintaining courtroom order and security, the trial court did not abuse its discretion in ordering the removal of a single disorderly spectator. Accordingly, we hold that the trial court did not violate appellant's constitutional right to a public trial. Based upon

the foregoing, we overrule appellant's first assignment of error.

*State v. Sowell,* 2008 WL 2600222, at \*5-11.[1]

The factual findings of the state appellate court are presumed to be correct. 28 U.S.C. §

2254(e)(1) provides:

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

Further, a federal habeas court may not grant relief unless the state court's decision was contrary to

or an unreasonable application of clearly established federal law, or based on an unreasonable

determination of the facts in light of the evidence that was presented. 28 U.S.C. § 2254(d) provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
>
>> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>>
>> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The United States Court of Appeals for the Sixth Circuit has summarized this standard as follows:

---

[1] Petitioner raised this same claim in post conviction proceedings, supported by affidavits. The state appellate court, however, refused to address the merits of his claim in post conviction proceedings, as barred under Ohio's doctrine of *res judicata. See State v. Sowell*, 2008 WL 852601, at \*6.

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or if the state court decides a case differently than the Supreme Court on materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct legal principle from the Supreme Court's decisions but unreasonably applies it to the facts of the petitioner's case.

*Boykin v. Webb,* 541 F.3d 638, 642 (6th Cir. 2008) (quoting *Williams v. Taylor,* 529 U.S. 362 (2000)).  This Court is not persuaded that Petitioner has met this standard here.

The Sixth Amendment to the United States Constitution provides "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial...."  U.S. Const. amend. VI.[2]  Denial of the right to a public trial constitutes structural error which is not subject to harmless error review.  *Drummond v. Houk*, 761 F.Supp.2d 638, 668 (N.D. Ohio 2010)(citing *Johnson v. United States*, 520 U.S. 461, 468-69 (1997); *Arizona v. Fulminante*, 499 U.S. 279, 310 (1991)).


The right to a public trial has been recognized "without exception" by "all courts" acknowledging "that an accused is at the very least entitled to have his friends, relatives and counsel present, no matter with what offense he may be charged."  *In re Oliver,* 333 U.S. 257, 271-72 (1948)(citation and footnote omitted).  "The requirement of a public trial is for the benefit of the accused; that the public may see he is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility. . . ."  *Waller v. Georgia*, 467 U.S. at 46 (quoting *In re Oliver,* 333 U.S. at 270 n.25).  The Constitution encompasses the right to a public trial, as the founders feared the practice of secret

---

[2]  The First Amendment protects the press and the public's right to a public trial.  *See Press-Enterprise Co. v. Superior Court of Ca.,* 464 U.S. 501 (1984).

trials which they viewed as a "menace to liberty." *In re Oliver*, 333 U.S. at 268-270. The guarantee

of a public trial "has always been recognized as a safeguard against any attempt to employ our courts

as instruments of persecution. The knowledge that every criminal trial is subject to contemporaneous

review in the forum of public opinion is an effective restraint on possible abuse of judicial power."

*Id.* at 270. The right to a public trial under the Sixth Amendment is not absolute, however, and

"may give way in certain cases to other rights or interests" although such circumstances are rare.

*Waller,* 467 U.S. at 45.

In *Waller*, the United States Supreme Court held that in order to determine whether the

closure of trial proceedings is constitutionally permissible, the Court must conduct a four part test:

(1) "[T]he party seeking to close the hearing must advance an overriding interest that is likely to be

prejudiced"; (2) "the closure must be no broader than necessary to protect that interest"; (3) "the

trial court must consider reasonable alternatives to closing the proceeding"; and (4) "it must make

findings adequate to support the closure." 467 U.S. at 48. *Waller* involved the total closure of

proceedings on the hearing of a motion to suppress evidence. Only "witnesses, court personnel, the

parties, and the lawyers" were permitted in the courtroom during the hearing. *Id.* at 39.

At the time of the Ohio Court of Appeals decision in this case, the United States Supreme

Court had not addressed the constitutionality of a partial closing of proceedings, either to a particular

person or for a limited duration. *Drummond,* 761 F. Supp. 2d at 671. In *Presley v. Georgia*, – U.S.

– , 130 S.Ct. 721 (2010), the United States Supreme Court addressed the closure of only *voir dire*

proceedings to the criminal defendant's brother. Notably, the defendant's brother had been the sole

person to appear for attendance of *voir dire* proceedings. It appears, however, that the trial court

had closed *voir dire* in *Presley* to anyone who would have been interested in attending due to an

alleged lack of space to accommodate jurors.[3]  The Supreme Court held that before closing any aspect of trial proceedings to the public, a trial court must "take every reasonable measure to accommodate public attendance at criminal trials," regardless of whether such alternatives are offered by the parties.  *Id*. at 725.  Some of these possibilities may include "reserving one or more rows for the public; dividing the jury venire panel to reduce courtroom congestion; or instructing

---

[3]  The Supreme Court described the facts of *Presley* as follows*:*

Before selecting a jury in Presley's trial, the trial court noticed a lone courtroom observer. . . . The court explained that prospective jurors were about to enter and instructed the man that he was not allowed in the courtroom and had to leave that floor of the courthouse entirely. . . .  The court then questioned the man and learned he was Presley's uncle. . . .  The court reiterated its instruction:

" 'Well, you still can't sit out in the audience with the jurors. You know, most of the afternoon actually we're going to be picking a jury. And we may have a couple of pre-trial matters, so you're welcome to come in after we ... complete selecting the jury this afternoon. But, otherwise, you would have to leave the sixth floor, because jurors will be all out in the hallway in a few moments. That applies to everybody who's got a case.' "

Presley's counsel objected to " 'the exclusion of the public from the courtroom,' " but the court explained, " '[t]here just isn't space for them to sit in the audience.' ". . .  When Presley's counsel requested " 'some accommodation,' " the court explained its ruling further:

" 'Well, the uncle can certainly come back in once the trial starts. There's no, really no need for the uncle to be present during jury selection.... [W]e have 42 jurors coming up. Each of those rows will be occupied by jurors. And his uncle cannot sit and intermingle with members of the jury panel. But, when the trial starts, the opening statements and other matters, he can certainly come back into the courtroom.' "

*Presley*, 130 S.Ct. at 722.

prospective jurors not to engage or interact with audience members." *Id*. at 725. The Supreme Court declined in *Presley* to decide whether a partial closing of trial proceedings required the trial court to identify an "overriding interest likely to be prejudiced absent the closure" as set forth for a total closure of proceedings under *Waller,* but stated:

> There are no doubt circumstances where a judge could conclude that threats of improper communications with jurors or safety concerns are concrete enough to warrant closing *voir dire*. But in those cases, the particular interest, and threat to that interest, must "be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered." *Press-Enterprise I, supra*, at 510, 104 S.Ct. 819; *see also Press-Enterprise Co. v. Superior Court of Cal., County of Riverside*, 478 U.S. 1, 15, 106 S.Ct. 2735, 92 L.Ed.2d 1 (1986) ("The First Amendment right of access cannot be overcome by the conclusory assertion that publicity might deprive the defendant of [the right to a fair trial]").

*Id.* at 725.


The United States Supreme Court issued its decision in *Presley* long after Petitioner's appeal had already concluded. At the time of the Ohio Court of Appeals decision in this case, courts disagreed whether, and to what extent, *Waller* applied to trial closures of limited duration or limited persons.

> [Prior to *Presley*, t]here was no clearly established federal law concerning partial courtroom closures. Indeed, . . . circuit courts disagreed whether *Waller* strictly extended to partial closure cases. . . and many opted to apply a modified *Waller* test. *Compare United States v. Osborne,* 68 F.3d 94, 98-99 (5th Cir. 1995) (noting that the Second, Eighth, Ninth, Tenth, and Eleventh Circuits all applied a modified *Waller* test to partial closings and itself applying that modified test) (citations omitted), *with Walton v. Briley,* 361 F.3d 431, 433 (7th Cir. 2004) (applying *Waller* test, without any modifications, to partial closure). Several circuits held that the first part of the *Waller* test was met where there was a "substantial reason"

justifying a partial closure rather than an "overriding interest." These courts reasoned that a less strict standard was all that was required because a partial closure does not implicate the same secrecy and fairness concerns of a total closure. *E.g., Garcia v. Bertsch,* 470 F.3d 748, 753 (8th Cir. 2006); *Osborne,* 68 F.3d at 98-99; *Woods,* 977 F.2d at 76; *Sherlock,* 962 F.2d at 1357; *Nieto,* 879 F.2d at 753; *Douglas,* 739 F.2d at 533. The circuits agreed, however, that the remaining three parts of the *Waller* test should be applied without modification.

*Drummond.* 761 F.Supp.2d at 671.

Under 28 U.S.C. § 2254(d)(1), in determining whether a habeas corpus petitioner is entitled to relief, this Court is required to consider whether the state courts have unreasonably applied the holdings (as opposed to *dicta)* of the United States Supreme Court in effect at the time of the state court's decision. *Williams v. Taylor,* 529 U.S. at 412. Thus, this Court cannot conclude that the state appellate court unreasonably applied *Waller. Waller* involved the total closure of court proceedings. This case involves the constitutionality of the trial court's authority to remove Petitioner's brother from the court proceedings after court personnel reported he had made a threatening gesture to a prosecution witness. Moreover, the Supreme Court has indicated, in other decisions regarding the Sixth Amendment's right to a public trial that the right belongs to the accused, and not to the public, stating:

> Obviously, the public trial guarantee is not violated if an individual member of the public cannot gain admittance to a courtroom because there are no available seats. The guarantee will already have been met, for the 'public' will be present in the form of those persons who did gain admission. Even the actual presence of the public is not guaranteed. A public trial implies only that the court must be open to those who wish to come, sit in the available seats, conduct themselves with decorum, and observe the trial process.

*Estes v. State of Texas*, 381 U.S. 532, 588-89 (1965)(Justice Harlan, concurring opinion). In *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 610 (1978), the United States Supreme Court similarly

stated , "[t]he requirement of a public trial is satisfied by the opportunity of members of the public and the press to attend the trial and to report what they have observed." Such were the circumstances here.

Claim one is without merit.

## CLAIMS TWO, FIVE AND SIX

In claim two, Petitioner asserts he was denied effective assistance of counsel because his attorney failed to replace a juror who feared Petitioner; failed to contest the trial court's removal of Stefan Sowell, Petitioner's brother, from trial proceedings without a hearing; failed to object to the removal of Joseph Sowell, Petitioner's father, from trial proceedings without a hearing; did not oppose the removal of a family friend from trial proceedings without a hearing; failed to request a *voir dire* of the jury after a Stefan Sowell allegedly threatened a prosecution witness; failed to present exculpatory alibi witnesses; and failed to present witnesses who would have testified as to Petitioner's incapability or diminished capacity to commit murder.

The state appellate court rejected Petitioner's on-the-record claims of ineffective assistance of trial counsel claim as follows:

> Appellant contends in his second assignment of error that he received ineffective assistance of counsel at trial. To demonstrate ineffective assistance of counsel, a criminal defendant must meet a two-part test. *Strickland v. Washington* (1984), 466 U.S. 668, 687,104 S.Ct. 2052, 80 L.Ed.2d 674. Initially, a defendant must show that counsel's performance was deficient. *Id*. This requires a showing that counsel made errors so serious that counsel was not functioning as the "counsel guaranteed the defendant by the Sixth Amendment." *Id*. Appellant has the burden of overcoming the strong presumption that trial counsel's performance was adequate or that counsel's action might be sound trial strategy. *State v. Smith* (1985), 17 Ohio St.3d 98, 100, 477 N.E.2d 1128. "Ultimately, the reviewing court must decide whether, in light of all the circumstances, the challenged act or

omission fell outside the wide range of professionally competent assistance." *State v. DeNardis* (Dec. 19, 1993), 9th Dist. No. 2245, citing *Strickland,* at 689.

A defendant must then show that counsel's deficient performance prejudiced the defense. *Strickland.* This requires a demonstration that "there exists a reasonable probability that, were it nor for counsel's errors, the result of the trial would have been different." *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph three of the syllabus. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, at 694.

Appellant first asserts that defense counsel was ineffective in failing to contest the removal of appellant's family member from the proceedings. More specifically, appellant argues that defense counsel's "blind acceptance" of the prosecutor's claim that appellant's family member made a threatening gesture at Crump, coupled with defense counsel's failure to request that the trial court query the jurors to determine if any of them were aware of the incident, and, if so, whether it affected their ability to render a fair and impartial verdict, fell below an objective standard of reasonableness. (Appellant's brief, at 12.) Appellant further contends he was prejudiced by defense counsel's failures because if the jurors observed the incident, there was "a reasonable likelihood that they would have felt fear or at a minimum, negative feelings about the defendant or his family. In a close case such as this, where there is clearly not overwhelming evidence of guilt, this type of unchecked occurrence could easily have swayed a jury member." *Id.*

Because we have concluded that the trial court did not err in barring the offending spectator from the courtroom for the remainder of appellant's trial, defense counsel was not ineffective for failing to object to the removal. To the extent that appellant challenges the factual basis for the removal (*i.e.*, the threatening gesture), his challenge is pure speculation. Nothing in the record supports appellant's suggestion that the removed spectator did not make the threatening gesture. Moreover, a challenge to the removal or an inquiry of whether any of the jurors noticed the conduct of the spectator would have drawn more attention to the incident. Therefore, defense counsel's failure to object or to pursue further inquiry may have been a trial tactic. Implementation of a reasonable trial tactic will not support a claim of ineffective assistance of counsel. *State v. Gumm* (1995), 73 Ohio St.3d 413, 428, 653 N.E.2d 253. Strategic trial decisions are left to the deference of trial counsel and may not

be second-guessed by reviewing courts. *State v. Carter* (1995), 72 Ohio St.3d 545, 558, 651 N.E.2d 965. Accordingly, appellant has not shown that his trial counsel's performance was deficient.

Further, appellant has failed to demonstrate how trial counsel's failure to object to the removal of the spectator would have resulted in a different trial verdict. Nothing in the record indicates that any juror observed the threatening gesture. Discussion between counsel and the trial court regarding the removal of the spectator was conducted outside the presence of the jury. Thus, appellant's assertions are pure speculation.

Appellant next contends that trial counsel was ineffective in failing to request that a juror who expressed her fear of appellant during the trial be removed from the jury. We disagree.

The day before he was scheduled to testify, Crump sat in the spectator area of the courtroom and presumably heard the testimony of other prosecution witnesses. The prosecutor notified the trial court of the situation, and, following a discussion with defense counsel, the court resolved the issue to the satisfaction of both parties.

The next day, one of the jurors alerted the jury commissioner that she had recognized a courtroom spectator the previous day and that she was "anxious" about it and wanted to report it to the court. (Tr. 569.) The trial judge told the jury commissioner he would deal with the situation "when the other lawyers are present along with the court reporter." *Id*. When the juror questioned appellant's attendance at that inquiry, the trial court explained that appellant had a right to be present. The juror then asked if the names of the jurors were provided to anyone other than the judge. The court responded that because jury service is a matter of public record, anyone so inclined could ascertain juror's names; however, neither the court nor counsel would provide individual juror names.

Seemingly satisfied with that response, the juror averred that during the previous day's testimony, a person she recognized from her childhood as a "class clown" sat on the "defense side" side of the courtroom; as such, she felt obligated to report the incident. (Tr. 572.) She described the person as wearing a beige shirt and a goatee and that she believed his name to be Tony or Anthony.

The prosecutor determined that the person to whom the juror referred

was Crump. Upon questioning by the court, the prosecutor, and defense counsel, the juror indicated that her limited affiliation with Crump would not affect her ability to fairly and impartially evaluate his testimony; she also stated that she was neither intimidated nor threatened by him. She further indicated that she notified the court after she realized she might know him because she was afraid that her failure to recognize his name during the voir dire process would later become an issue.

Upon further questioning by defense counsel, the juror averred that "not knowing the purpose of him being in the courtroom, and then him being familiar to me, I guess it concerned me, my concerns arose because if he knows me, depending on the outcome of the trial from the issues from whatever purpose he is in the courtroom for, it made me nervous him coming in here and not to mention he is a familiar face and not knowing the proceedings of the court." (Tr. 576-577.) When defense counsel asked if she was "just concerned about if he knew you and if there would be any fallout from the decision from you and your fellows jurors, and if he recognized you," the juror responded, "[y]es, that is a concern, but being this is a collective decision." (Tr. 577.) She reiterated that she did not feel threatened and that she could fairly and impartially decide the case. She further indicated she wanted to continue to serve on the jury. Neither the prosecutor nor defense counsel objected to the juror's continued service, and the trial court resolved to keep the juror on the panel.

Appellant has failed to meet his burden regarding trial counsel's alleged deficient performance in failing to object to the juror's continued service on the jury. Initially, we are not persuaded that the juror's questions about appellant's presence during the inquiry and whether her name would be provided necessarily inferred that she feared appellant. The juror never stated that she feared appellant and seemed satisfied by the trial court's explanation regarding his presence at the inquiry. The juror's concerns seemed to be centered on Crump, not appellant. In addition, defense counsel thoroughly questioned the juror.

Further, appellant has failed to demonstrate how trial counsel's failure to object to the juror's continued service would have resulted in a different trial verdict. The juror repeatedly stated that she could fairly and impartially decide the case. As the record contains no evidence suggesting that the juror feared or was biased against appellant, we cannot find that there was any reason to remove the juror from the panel. Accordingly, we find no prejudice to appellant

from trial counsel's failure to object to this juror remaining on the panel. The second assignment of error is overruled.

*State v. Sowell*, 2008 WL 2600222, at *11-14. Again, these factual findings of the state appellate court are presumed to be correct. 28 U.S.C. § 2254(e). Further, this Court may not grant habeas corpus relief unless the state appellate court contravened or unreasonably applied federal law as determined by the United States Supreme Court, or its decision unreasonably applied the facts in light of the evidence presented. 28 U.S.C. § 2254(d). Such are not the circumstances here.

The right to counsel guaranteed by the Sixth Amendment is the right to effective assistance of counsel. *Powell v. Alabama,* 287 U.S.45, 53 (1932). The standard for reviewing a claim of ineffective assistance of counsel is twofold:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland v. Washington*, 466 U.S. at 687; *see also Blackburn v. Foltz,* 828 F.2d 1177 (6th Cir. 1987). "Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland,* 466 U.S. at 689.

To establish prejudice, it must be shown that there is a reasonable probability that, but for counsel's errors, the result of the proceedings would have been different. *Id.,* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.,* at 697. Because

petitioner must satisfy both prongs of the *Strickland* test to demonstrate ineffective assistance of counsel, if the Court determines that petitioner has failed to satisfy one prong, it need not consider the other. *Strickland,* 466 U.S. at 697.

Preliminarily, Petitioner argues that the state appellate court unreasonably applied *Strickland* in concluding Petitioner had failed to establish prejudice since none of the alleged errors set forth by Petitioner would have resulted in a different trial verdict. Petitioner contends that this conclusion is an unreasonable application of prejudice, as that term is defined in *Strickland.* This Court is not persuaded by Petitioner's argument. The state appellate court properly set forth the two-prong *Strickland* test in considering the merits of Petitioner's claims. Further, this Court agrees that the record fails to reflect that any of counsel's alleged errors resulted in prejudice, as that term is defined in *Strickland.*

Because, as discussed *supra*, the trial court did not improperly remove Petitioner's brother, Stefan Sowell from trial proceedings without first conducting a hearing, Petitioner cannot establish either that his attorney acted unreasonably or that he was prejudiced thereby based on counsel's failure to raise the issue at trial. The record is without support to indicate that any juror witnessed Petitioner's brother making threatening gestures or that Petitioner was prejudiced by his attorney's failure to request a *voir dire* of the jury on this issue. Similarly, and contrary to Petitioner's contentions here, the record fails to support his claim that any juror was biased against him. As discussed by the state appellate court, during trial, a juror, indicated that she had recognized one of the witnesses. *Trial Transcript*, at 569. The Court and counsel questioned her outside of the presence of the remainder of the jury. *Id.* She wanted to know if her name would be given out to anyone in the courtroom. *Id*. at 571. The Court advised her that her name was a matter of public

record, but would not be revealed to anyone by the Court or the attorneys.  *Id.*  She had recognized

a witness who came into the courtroom from twenty years ago in the sixth grade.  *Id.* at 573.  She

denied that anything about her relationship with him or his actions would affect her ability as a fair

and impartial juror or to evaluate his testimony the same as any other witness.  *Id.* at 574.

> COURT: Do you feel intimidated by this person?
>
> [JUROR]:  No.
>
> ***
>
> COURT: When he looked at you, did you feel threatened?
>
> [JUROR]: No.

*Id.* at 575.

> MR. SCHUMACHER: So you're just concerned about if he knew you and if there would be any fallout from the decision from you and your fellow jurors, and if he recognized you?
>
> [JUROR]: Yes, that is a concern, but being this is a collective decision.
>
> MR. SCHUMACHER: You don't have any reason at this point to feel threatened or anything like that?
>
> [JUROR]: No, no, there is no reason to feel that way.

*Id.* at 577.

> COURT: So you're telling me in no way would this influence your thinking and your ability to sit and decide this case fairly and impartially?
>
> [JUROR]: That is correct.
>
> COURT: Do you wish to continue to serve as a juror in this case?
>
> [JUROR]:  Yes, sir.

*Id.* at 577-78. Thus, Petitioner has failed to establish ineffective assistance of counsel based on his attorney's failure to request the removal of the juror as biased. Claim two, therefore, is without merit. Moreover, habeas corpus claim five, in which Petitioner asserts that he was denied a fair trial because this juror was not removed from the jury, likewise is without merit.

The remainder of Petitioner's claims of ineffective assistance of counsel appear to be procedurally defaulted. Respondent did not address these claims in the *Return of Writ*. The Court does not ordinarily *sua sponte* raise the affirmative defense of procedural default. *See Trest v. Cain*, 522 U.S. 87, 89 (1997)(state's failure to raise procedural default normally constitutes waiver of the default); *Gray v. Netherland*, 518 U.S. 152, 166 (1996) (procedural default is normally an affirmative defense that will be waived if not raised). This Court, however, is not precluded from doing so particularly where, as here, Petitioner has the opportunity to respond to the issue of procedural default in any objections he files, and the Respondent's failure to raise the issue appears to have been an oversight in failing to address any of these claims. *See Howard v. Bouchard,* 405 F.3d 459, 476 (6th Cir. 2005), *r'hng and r'hng en banc denied* July 6, 2005 (citing *Lorraine v. Coyle,* 291 F.3d 416, 426 (6th Cir. 2002)); *Elzy v. United States,* 205 F.3d 882, 886 (6th Cir. 2000).

## PROCEDURAL DEFAULT

In recognition of the equal obligation of the state courts to protect the constitutional rights of criminal defendants, and in order to prevent needless friction between the state and federal courts, a state criminal defendant with federal constitutional claims is required to present those claims to the highest court of the state for consideration. 28 U.S.C. § 2254(b), (c). If the petitioner fails to do so, but the state still provides a remedy to pursue, his or her petition is subject to dismissal for failure to exhaust state remedies. *Id.*; *Coleman v. Thompson,* 501 U.S. 722, 731 (1991); *Deitz v.*

*Money,* 391 F.3d 804, 808 (6th Cir. 2004). If, because of a procedural default, the petitioner can no longer present the relevant claims to a state court, the petitioner also waives the claims for purposes of federal habeas review unless he or she can demonstrate cause for the procedural default and actual prejudice resulting from the alleged constitutional error. *Edwards v. Carpenter,* 529 U.S. 446, 451 (2000); *Coleman*, 501 U.S. at 724; *Murray v. Carrier,* 477 U.S. 478, 485 (1986).

In the Sixth Circuit, a court must undertake a four-part analysis to determine whether procedural default is a bar to a habeas petitioner's claims. *Maupin v. Smith,* 785 F.2d 135, 138 (6th Cir. 1986); *see also Scuba v. Brigano*, 259 F. App'x. 713, 718 (6th Cir. 2007) (following the four-part analysis of *Maupin*). Specifically, the United States Court of Appeals for the Sixth Circuit requires the district courts to engage in the following inquiry:

> First, the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule. . . . Second, the court must decide whether the state courts actually enforced the state procedural sanction. . . . Third, the court must decide whether the state procedural forfeiture is an adequate and independent state ground on which the state can rely to foreclose review of a federal constitutional claim.

*Maupin,* 785 F.2d at 138 (internal quotations omitted). Finally, if "the court determines that a state procedural rule was not complied with and that the rule [has] an adequate and independent state ground, then the petitioner" may still obtain review of his claims on the merits if he establishes: (1) a substantial reason to excuse the default and (2) that he was actually prejudiced by the alleged constitutional error. *Id.* 'Cause' under this test "must be something *external* to the petitioner, something that cannot fairly be attributed to him[;] . . . some factor external to the defense [that] impeded [] efforts to comply with the State's procedural rule." *Coleman*, 501 U.S. at 753. This "cause and prejudice" analysis also applies to failure to raise or preserve issues for review at the

appellate level or failure to appeal at all. *Id* at 750.

Nevertheless, "'[i]n appropriate cases' the principles of comity and finality that inform the concepts of cause and prejudice 'must yield to the imperative of correcting a fundamentally unjust incarceration.'" *Murray*, 477 U.S. at 495 (quoting *Engle v. Isacc,* 456 U.S. 107, 135 (1892)). Petitioners who fail to show cause and prejudice for procedural default may nonetheless receive a review of their claims if they can demonstrate that a court's refusal to consider a claim would result in a "fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750; *see also Lott v. Coyle,* 261 F.3d 594, 601–02 (6th Cir. 2001) (same). The fundamental miscarriage of justice exception requires a showing that "in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *Schlup v. Delo*, 513 U.S. 298, 329 (1995).

Petitioner asserts he was denied effective assistance of counsel because his attorney failed to call certain witnesses who would have provided an alibi defense or established his incapacity or diminished capacity to commit murder. Petitioner properly raised this off-the-record claim in post conviction proceedings. He failed to raise the same issue in the Ohio Court of Appeals. Further, he may now no longer do so under Ohio's doctrine of *res judicata. See State v. Cole*, 2 Ohio St.3d 112 (1982); *State v. Ishmail*, 67 Ohio St.2d 16 (1981); *State v. Perry*, 10 Ohio St.2d 175 (1967).

Similarly, Petitioner asserts he was denied effective assistance of counsel because his attorney failed to contest the removal of his father and family friend from trial proceedings without a hearing. Again, Petitioner raised the foregoing claims in post conviction proceedings. The state appellate court refused to address the merits of the claims as barred under Ohio's doctrine of *res judicata*:

> [Petitioner's] first claim is that his attorney was ineffective for failing
> to assert his right to a public trial by objecting to the ejection of

34

spectators. For support of this claim, appellant offered the affidavits of Joseph and Stephan Sowell, along with a copy of a portion of the trial transcript.

In his affidavit, appellant's father, Joseph, describes how he was ejected from the courtroom for laughing during testimony, and that a friend of the family was ejected for wiping sweat from his face. He states that he has "every reason to believe that the jury was aware of this incident * * *." FN1 He avers that he told appellant's attorney about these events, but the attorney did nothing. In his affidavit, appellant's brother, Stephan, states that a deputy sheriff removed him from the courtroom as the jury was departing, because, according to the deputy, he had made a gesture toward a witness that simulated the shooting of a gun. Stephan Sowell denies that he ever made such a gesture. Stephan Sowell states that the jury saw and heard him being removed from the courtroom, but that appellant's attorney was unaware of these events.

FN1. Joseph Sowell Affidavit, ¶ 3.

The trial transcript reveals that, after Stephan Sowell was removed, the prosecutor made the court and appellant's counsel aware of Stephan Sowell's ejection, and the reason therefor.

* * *

The right to a public trial is set forth in the Sixth Amendment of the Constitution of the United States which provides, in pertinent part: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial * * *." In *State v. Sanders* (1998), 130 Ohio App.3d 92, 719 N.E.2d 619, the court explained:

The right to a public trial has historically been recognized as a safeguard against possible infringements by the court against the accused. An open courtroom is necessary to preserve and support the fair administration of justice because it encourages witnesses to come forward and be heard by the public, discourages perjury by the witnesses, and ensures that the judge and prosecutor will carry out their duties properly. Also, a public trial allows the general public to see that the defendant is "fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions." The right to a public trial is so important that a criminal defendant is not required to show specific prejudice to obtain relief from the constitutional violation.

(Citations omitted.) *Id.* at 96-97.

Nonetheless, the right to a public trial is not absolute and an order barring spectators from observing a portion of an otherwise public trial does not necessarily introduce error of constitutional dimension. *State v. Cottrell,* Cuyahoga App. No. 81356, 2003-Ohio-5806, ¶ 18, discretionary appeal not allowed, 101 Ohio St.3d 1491, 2004-Ohio-1293, 805 N.E.2d 540, citing *Brown v. Kuhlmann* (C.A.2, 1998), 142 F.3d 529. "[T]he trial judge is responsible for the conduct of a trial and has discretion to issue reasonable orders excluding spectators in order to protect or to prevent intimidation of a witness." *State v. Bayless* (1976), 48 Ohio St.2d 73, 109, 2 O.O.3d 249, 357 N.E.2d 1035, vacated in part on other grounds, *Bayless v. Ohio* (1978), 438 U.S. 911, 98 S.Ct. 3135, 57 L.Ed.2d 1155.

Joseph Sowell's affidavit states that he informed appellant's trial attorney about the fact that he and another spectator had been ejected from the courtroom. However, he does not state when he informed counsel of this fact. If counsel was not made aware of the ejection until after trial, then he was not ineffective for failing to address the issue during trial. Even if we read Joseph Sowell's affidavit to mean that he immediately informed trial counsel, the events that appellant's father describes do not rise to the level of a constitutional violation. The affidavits supporting a petition for postconviction relief must present information that rises to the level of a constitutional violation. *State v. Calhoun,* 86 Ohio St.3d 279, 284, 1999-Ohio-102, 714 N.E.2d 905, citing *State v. Perry* (1967), 10 Ohio St.2d 175, 30 O.O.2d 189, 226 N.E.2d 104. In order to present evidence of a constitutional violation based on ineffective assistance of counsel, "the petitioner bears the initial burden to submit evidentiary documents containing sufficient operative facts to demonstrate the lack of competent counsel and that the defense was prejudiced by counsel's ineffectiveness." (Emphasis sic.) *Id.* at 283, quoting *State v. Jackson* (1980), 64 Ohio St.2d 107, 18 O.O.3d 348, 413 N.E.2d 819, syllabus.

Moreover, because the exclusion of Stephan Sowell from the courtroom occurred on the record at trial, this alleged error could have been raised on direct appeal. For this reason, postconviction collateral attack on this ground is barred by *res judicata*. "Postconviction review is a narrow remedy, since *res judicata* bars any claim that was or could have been raised at trial or on direct appeal." *State v. Steffen*, 70 Ohio St.3d 399, 410, 1994-Ohio-111, 639 N.E.2d 67.

For these reasons, the trial court did not err in dismissing appellant's first claim for relief without a hearing. Accordingly, appellant's first assignment of error is overruled.

In his second assignment of error, appellant argues that the trial court erred in dismissing his second claim for relief. His second claim is that his trial counsel was ineffective for failing to request that the court *voir dire* the jury to determine whether Stephan Powell had prejudiced any member by having allegedly made a threatening gesture toward witness Anthony Crump. (Petition, at 5-6.)

On appeal, appellant asserts that the mention in Joseph Powell's affidavit of his own ejection for laughing and of the ejection of another spectator for wiping his face, presents matters outside the record. However, careful review of appellant's petition for postconviction relief reveals that his second claim for relief was based solely upon the prejudice that might have resulted from Stephan Powell's allegedly threatening gesture. Because this alleged error, too, is reflected in the trial record, it could have been raised on direct appeal and is thus barred by *res judicata*. Accordingly, the trial court correctly dismissed it without a hearing. For this reason, the second assignment of error is overruled.

*State v. Sowell*, 2008 WL 852601, at *4-6.

Although the state appellate court alternatively dismissed petitioner's claim on the merits, such alternative ruling does not forgive the waiver or otherwise revive the claim for purposes of habeas corpus review. *Harris v. Reed*, 489 U.S. 255, 264 n. 10 (1989) ("a state court need not fear reaching the merits of a federal claim in an *alternative* holding"); *Bowling v. Parker*, 344 F.3d 487, 498 (6th Cir. 2003) (where state court's dismissal of claim on merits constitutes an alternative holding, federal habeas court will consider the claim procedurally defaulted); *Kenney v. Haviland,* No. 1:04 CV 2194, 2006 WL 2792171, at *6 n. 8 (N.D. Ohio Sep.26, 2006) ("The mere existence of the clear statement rule confirms that an alternative holding on the merits cannot save a claim where the court clearly and expressly enforces a state procedural bar").

Ohio's *res judicata* rule is adequate and independent under the third part of the *Maupin* test.

To be "independent," the procedural rule at issue, as well as the state court's reliance thereon, must rely in no part on federal law.  *See Coleman v. Thompson,* 501 U.S. 722, 732-33, (1991).  To be "adequate," the state procedural rule must be firmly established and regularly followed by the state courts. *Ford v. Georgia,* 498 U.S. 411 (1991).  "[O]nly a 'firmly established and regularly followed state practice' may be interposed by a State to prevent subsequent review by this Court of a federal constitutional claim." *Id.* at 423 (quoting *James v. Kentucky,* 466 U.S. 341, 348-351 (1984)).  Further, the Court of Appeals for the Sixth Circuit has consistently held that Ohio's doctrine of *res judicata, i.e.*, the *Perry* rule, is an adequate ground for denying federal habeas relief. *Lundgren v. Mitchell*, 440 F.3d 754, 765 (6th Cir. 2006); *Coleman v. Mitchell*, 268 F.3d 417, 427-29 (6th Cir. 2001); *Seymour v. Walker*, 224 F.3d 542, 555 (6th Cir. 2000); *Byrd v. Collins*, 209 F.3d 486, 521-22 (6th Cir. 2000); *Norris v. Schotten*, 146 F.3d 314, 332 (6th Cir. 1998). The doctrine of *res judicata* is stated in unmistakable terms in countless Ohio decisions, and Ohio courts have consistently refused, in reliance on that doctrine, to review the merits of claims. *State v. Cole,* 2 Ohio St.3d at 112; *State v. Ishmail*, 67 Ohio St.2d at 16.  Further, the doctrine of *res judicata* serves the state's interest in finality and in ensuring that claims are adjudicated at the earliest possible opportunity. With respect to the independence prong, the Court concludes that the procedural rule of *res judicata* does not rely on or otherwise implicate federal law.

Petitioner thereby has waived these aspects of his claim of ineffective assistance of counsel for federal habeas corpus review.  Additionally, he has failed to establish cause for this procedural default.  *See Maples v. Stegall*, 340 F.3d 433, 438 (6th Cir. 2003)("'[C]ause' . . . must be something external to the petitioner . . . that cannot fairly be attributed to him[;] . . . some objective factor external to the defense [that] impeded ... efforts to comply with the State's procedural rule.")(citing

*Coleman v. Thompson,* 501 U.S. 722, 753 (1991)).  Nothing in the record indicates that any external factor impeded Petitioner's ability to properly raise these claims.

Moreover, for the reasons discussed by the state appellate court, Petitioner's claim of ineffective assistance of counsel, as well as this underlying claim (i.e., habeas corpus claim six relating to the trial court's failure to voir dire the jury about the spectator's gestures) lack any merit. Nothing in the record establishes that any of the jurors witnessed any incident causing them to be biased against Petitioner such that he received a constitutionally unfair trial, or was denied effective assistance of counsel under *Strickland.*  Petitioner simply has failed to establish that the state court's rejection of these claims was unreasonable so as to warrant federal habeas corpus relief.[4]

----

[4]  The state appellate court rejected claim six of this habeas corpus petition in relevant part as follows:

> [A]ppellant argues that the trial court erred in dismissing his third and fourth claims for relief. Appellant's third claim for relief is that his conviction is void because a fearful, non-impartial jury rendered it. Specifically, he argues that the jury was fearful because members of the jury witnessed the ejection of appellant's father and another individual, and the threatening gesture of appellant's brother. For support of this claim, appellant relied upon the affidavits of Joseph and Stephan Sowell. However, review of these affidavits reveals that appellant's father only speculates that members of the jury witnessed and heard his and another's ejection from the gallery, but offers no evidence of this fact. Moreover, appellant's brother unequivocally denies having made any threatening gesture. If he never made the gesture, then the jury did not witness it. Appellant has presented no operative facts supporting his argument that the jury was fearful and biased and, as such, the trial court correctly dismissed his third claim for relief without a hearing.

> Appellant[]. . . [argues] that his conviction is void because the trial court had an independent duty to voir dire the jury to determine whether any member had been "effected in any manner by alleged gestures by spectators, or actions or comments made by deputy sheriffs present in the courtroom and in the area outside the courtroom during the trial." FN6 Again, appellant's evidence does not establish, but only speculates, that the jury was aware of the ejections of Joseph Sowell or the spectator who allegedly wiped his face. Moreover, Stephan Sowell denies having made any threatening gesture. Accordingly, appellant presented no operative facts

To the extent that Petitioner argues the collective errors of counsel prejudiced him as that term is defined under *Strickland,* this argument is not persuasive. Petitioner's claims are either without merit or waived for review. He cannot, therefore, establish he was prejudiced by the collective errors of counsel.

Claim two is without merit and procedurally defaulted; claims five and six are without merit

## CLAIM THREE

In claim three, Petitioner asserts that he was denied a fair trial due to admission of out-of-context excerpts of recordings in lieu of the entire conversation. Respondent contends that this claim is waived due to Petitioner's failure to present the issue to the state courts as a federal constitutional issue.

In order to exhaust available state remedies, a petitioner must first fairly present the substance of his federal habeas corpus claims to the state courts. *Picard v. Connor*, 404 U.S. 270, 275 (1971); *Anderson v. Harless*, 459 U.S. 4, 6 (1982). "The state courts must be provided with a fair opportunity to apply controlling legal principles to the facts bearing upon petitioner's constitutional claims." *Sampson v. Love,* 782 F.2d 53, 55 (6th Cir. 1986). Petitioner does not fairly present his claim simply because the necessary facts supporting a federal constitutional claim are present or because the constitutional claim appears self-evident. *Haggins v. Warden*, 715 F2d 1050,

---

sufficient to warrant a hearing on the issue whether the trial court had any duty to voir dire the jury about these events. Therefore, the trial court correctly dismissed appellant's fourth claim for relief.

FN6. Petition for postconviction relief, at 7.

*State v. Sowell*, 2008 WL 852601, at *6.

1054 (6th Cir. 1983)(citing *Harless,* 459 U.S. at 6). Furthermore, "[a] petitioner 'fairly presents' his claim to the state courts by citing a provision of the Constitution, federal decisions employing Constitutional analysis, or state decisions employing constitutional analysis in similar fact patterns." *Levine v. Torvik*, 986 F.2d 1506, 1515 (6th Cir. 1993)(citing *Franklin v. Rose*, 811 F.2d 322, 326 (6th Cir. 1987)). Courts normally require more than a single broad generalization that petitioner was denied a "fair trial" or "due process of law." *Franklin*, 811 F.2d at 326; *Petrucelli v. Coombe*, 735 F.2d 684, 688 (6th Cir. 1984). Petitioner, however, need not "cite book and verse on the federal constitution." *Picard,* 404 U.S. at 277 (quoting *Daugharty v. Gladden*, 257 F.2d 750, 758 (9th Cit. 1960)). The Sixth Circuit has strictly followed the requirement that petitioner fairly presented his federal constitutional claims to the state courts as a precondition to federal habeas review. *Weaver v. Foltz*, 888 F.2d 1097, 1098 (6th Cir. 1989).

Petitioner asserted on direct appeal that admission of exerpts of his telephone calls from the jail were irrelevant and more prejudicial than probative, violating state evidentiary rules and denying Petitioner due process and a constitutionally fair trial. Petitioner did not, however, refer to any federal cases in support of his claim or any state cases relying on federal law. The state appellate court reviewed Petitioner's claim as follows:

> Appellant contends in his third assignment of error that the trial court erred in admitting the audiotape recordings of his jail calls. Appellant contends this evidence was irrelevant, did not indicate consciousness of guilt as argued by appellee, and, even if relevant, was more prejudicial than probative. Appellant maintains the improper admission of this evidence denied him his right to due process and a fair trial as guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Article I, Sections 2, 10, and 16 of the Ohio Constitution. We disagree.
>
> On the day trial was to commence, appellant filed a motion in limine seeking to preclude appellee from introducing the recordings of his

jail calls, any testimony pertaining to those calls, or both. Appellant argued that the calls were irrelevant to the issues in the case, and, even if relevant, were inadmissible under Evid.R. 403(A) because their probative value was substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.

The trial court held a hearing at which appellee played recordings of portions of numerous calls made by appellant between May 19, 2005 and May 31, 2005, and July 13, 2005 and July 27, 2005. Over appellant's objections, the trial court ruled that it would permit appellee to introduce excerpts of a few selected calls in its case-in-chief.

At trial, appellee played the allowed excerpts for the jury. In the first excerpt, appellant stated: "I was no where in the area. I don't know it's crazy," to which an unidentified female responded, "You shouldn't of [sic] been down there period." Appellant again stated, "I wasn't in the area." (Tr. 180 Insert.)

In the second excerpt, an unidentified female asked appellant, "Where were you at, at the time[?]." Appellant responded, "Not in the area, that's for damn sure. I saw the shit on the news. I was down at Suzy Q's, right there on 17th and 4th * * * (inaudible) pool hall with Brian." Later in the same conversation, the female asked appellant, "And do you even have anybody that will * * * say that you were with [them]." Appellant responded, "Yeah, Brian. * * * Just me and him * * * Nobody else." (Tr. 186 Insert.)

In the third excerpt, appellant and an unidentified male conversed, as follows:

[Appellant]: What's the deal with that nigger though

Male: Who, Who

[Appellant]: You know who I'm talkin[g] about

Male: Yeah, oh yeah. I don't know. Come talkin[g] about, he came back around the corner. You heard what they said didn't ya.

[Appellant]: Yeah

* * *

[Appellant]: That nigger wasn't no where near the area.

Male: He talkin[g] about he came back around the corner and seein you

[Appellant]: Of course

Male: Who was with him

[Appellant]: His cousin

Male: Who is this

[Appellant]: Pako, old thieven ass nigger

(Tr. 196 Insert.)

The conversation continued, as follows:

Male: They aint had nothin[g] to do with it

[Appellant]: Aint had nothing

Male: All he gotta to do is say I don't know who the fuck it was

[Appellant]: Um, hum

Male: That's all you had to do

[Appellant]: That's cause it's some he said * * * he saw you. So what

Male: Just cause he scared talkin[g] about (inaudible)

[Appellant]: Yeah, go ask the mother fucker that saw it

Male: Deny that shit

[Appellant]: Yeah

Male: But that bitch had to tell it, you know

[Appellant]: Fuck [him]

(Tr. 198 Insert.)

In the fourth excerpt, appellant, speaking to an unidentified male, stated, "I was cooking out in the back yard[.] I never left." The man responded, "There was a lot of people there." Appellant agreed and named several men who allegedly attended the cookout. (Tr. 222 Insert.)

In the fifth and final excerpt, an unidentified male stated " * * * Neither one of [them] seen nothing * * *." Appellant responded, "Nothing. * * * All they saw was me standing on the porch." (Tr. 233 Insert.)

The prosecutor replayed these excerpts during his rebuttal closing argument, contending that in the first, second, fourth, and fifth excerpts, appellant made conflicting statements regarding his whereabouts during the time the crime was committed and that these inconsistencies established appellant's consciousness of guilt. In addition, although the trial court sustained defense counsel's objection to the prosecutor's contention that appellant was talking about Crump when he asserted in the third excerpt that "that nigger" was "nowhere in the area," the prosecutor thereafter argued that appellant's later assertion about "his cousin" referred to Crump's cousin, Andre Brown. The prosecutor contended that appellant's knowledge of Brown's presence in Crump's SUV established that it was appellant who conversed with the occupants of the SUV during the stop across from the carryout and, then later, according to Fares, entered the carryout and shot Jones.

A trial court has broad discretion in determining the admissibility of evidence. *State v. Maurer* (1984), 15 Ohio St.3d 239, 265, 473 N.E.2d 768, citing *State v. Hymore* (1967), 9 Ohio St.2d 122, 128, 224 N.E.2d 126. Accordingly, an appellate court should not interfere with a trial court's evidentiary rulings absent an abuse of discretion. *Id*. "An abuse of discretion 'connotes more than an error of law or of judgment; implies that the court's attitude is unreasonable, arbitrary or unconscionable.'" *State v. Jackson*, 107 Ohio St.3d 53, 836 N.E.2d 1173, 2005-Ohio-5981, at ¶ 181, quoting *State v. Adams* (1980), 62 Ohio St.2d 151, at 157, 404 N.E.2d 144.

Evid.R. 401 defines "relevant" evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Generally, all relevant evidence is admissible, and irrelevant evidence is inadmissible. Evid.R. 402. The statements at issue are clearly relevant, as they concern

appellant's possible involvement in the crime.

Further, a criminal defendant's out-of-court statement, offered against the defendant by the state, is admissible pursuant to Evid.R. 801(D)(2)(a). *State v. Johnson*, Butler App. No. CA2002-04-100, 2003-Ohio-2540, at ¶ 21. This rule permits the admission of such evidence when it is "offered against a party" and is the party's "own statement." It is uncontroverted that the recordings at issue were made from telephone calls originated by appellant while he was in jail awaiting trial and that the voice on the recordings is that of appellant; thus, the statements are admissible.

Appellant contends that the trial court erred in failing to exclude the statements pursuant to Evid.R. 403(A), which provides that otherwise relevant evidence is inadmissible "if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." A trial court, however, has broad discretion to determine whether relevant evidence must be excluded in accordance with Evid.R. 403(A) because " 'the exclusion of relevant evidence under Evid.R. 403(A) is even more of a judgment call than determining whether the evidence has logical relevance in the first place.' " (Emphasis sic .) *State v. Cromartie*, Medina App. No. 06CA0107-M, 2008-Ohio-273, ¶ 18, quoting *State v. Yarbrough,* 95 Ohio St.3d 227, 767 N.E.2d 216, 2002-Ohio-2126, at ¶ 40.

After a thorough review of the record in this case, including the transcript of the hearing on the motion in limine, we cannot find that the trial court abused its discretion in admitting the statements. At that hearing, the trial court diligently listened to each of the statements appellee sought to admit and heard extensive arguments from both parties as to each statement. The court meticulously culled the list to the five excerpts at issue and thoroughly explained its rationale for admitting them. Indeed, the court excluded several statements that arguably cut in favor of appellee. Because reasonable people could reach different conclusions regarding whether appellant's statements reflect inconsistencies in his whereabouts at the time of the murder, we find that the trial court did not abuse its discretion by admitting this relevant evidence. Nor did the trial court abuse its discretion by concluding that the probative value of this evidence was not substantially outweighed by the danger of unfair prejudice.

Further, appellee played the calls at the end of the trial. Therefore, the

jury was able to assess the calls in the context of all the evidence. As such, the jury could reasonably infer that appellant made conflicting statements as to his location at the time of the murder, thereby indicating that he was attempting to establish a false alibi. A criminal defendant's attempt to create a false alibi "strongly indicates consciousness of guilt." *State v. Issa*, 93 Ohio St.3d 49, 67, 752 N.E.2d 904, quoting *State v. Campbell* (1994), 69 Ohio St.3d 38, 47, 630 N.E.2d 339. Similarly, the jury could reasonably infer that appellant's statements regarding "his cousin" established that he knew Crump's cousin, Brown, was in the SUV because he conversed with the occupants during the stop across from the carryout.

In light of the foregoing, we overrule appellant's third assignment of error.

*State v. Sowell,* 2008 WL 2600222, at *14-17.

Assuming, *arguendo*, that Petitioner fairly presented his claim for federal habeas corpus review, his claim nonetheless is plainly without merit. Federal habeas review of state court evidentiary rulings is extremely limited. *Waters v. Kassulke*, 916 F.2d 329, 335 (6th Cir. 1990). Evidentiary questions generally do not rise to a constitutional level unless the error was so prejudicial as to deprive a defendant of a fundamentally fair trial, thereby violating due process. *Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir. 1983). When such errors are alleged, the federal court's inquiry in reviewing these claims is directed to whether the evidence was rationally connected to the crime charged. *Carter v. Jago,* 637 F.2d 449, 457 (6th Cir. 1980). Such were the circumstances here.

Claim three is without merit.

## CLAIM FOUR

In claim four, Petitioner asserts that the evidence was constitutionally insufficient to sustain his murder conviction. Petitioner argues that there was insufficient evidence to establish his identity

as the shooter, particularly in view of Fares inability to identify him as Jones' killer, Fares' description of the shooter, and the lack of any physical evidence reflecting his guilt. Additionally, Petitioner contends that the State relied on "impermissible inferences" by improperly arguing that Crump spoke to Petitioner from the SUV while Crump was parked across from the market. *Id.* at 59. The state appellate court rejected Petitioner's claim as follows:

> Appellant contends in his fourth assignment of error that his murder conviction is not supported by sufficient evidence. . . We disagree.
>
> "The legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different." *State v. Thompkins* (1997), 78 Ohio St.3d 380, 678 N.E.2d 541, paragraph two of the syllabus. " '[S]ufficiency is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law.'" *Id.* at 386, 678 N.E.2d 541, quoting Black's Law Dictionary (6 Ed.1990) 1433. "In essence, sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law." *Id.*, citing *State v. Robinson* (1955), 162 Ohio St. 486, 124 N.E.2d 148.
>
> "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.*
>
> ***
>
> R.C. 2903.02(A) proscribes murder, as follows: "[n]o person shall purposely cause the death of another * * *." The evidence presented by the state conclusively established that the perpetrator of the crime purposely caused the death of the victim by shooting him several times at point blank range; thus, the sole issue to be resolved by the jury was the identity of the perpetrator.

Crump testified that appellant approached Crump's SUV while Crump was stopped across the street from the carryout. Crump and his cousin spoke with appellant. Fares testified that the person who conversed with the occupants of the SUV walked across the street, entered the carryout, purchased a cigar, and shot Jones on his way out of the carryout. From this evidence, the jury could reasonably infer that appellant was the person who committed the murder. Further, in the calls appellant made from jail, he arguably made conflicting statements as to his whereabouts at the time of the murder. As noted previously, the jury could reasonably infer that appellant's conflicting statements established that he was attempting to create a false alibi. The jury could also reasonably infer that the statement regarding the "cousin" referred to Crump's cousin, Andre Brown, and that appellant's knowledge of Brown's presence in the SUV established that he was the person who spoke with Crump and Brown across the street from the carryout and later entered the carryout and shot Jones.

We recognize that the state's evidence in this case is entirely circumstantial. However, it is well-established that circumstantial evidence possesses the same probative value as direct evidence. *State v. Treesh* (2001), 90 Ohio St.3d 460, 739 N.E.2d 749. The jury unanimously convicted appellant of the crime. As noted previously, the jury's verdict is entitled to special deference in a manifest-weight review. *Thompkins, supra*, at 390, 678 N.E.2d 541. (Cook, J., concurring.) Indeed, "[o]n the trial of a case, either civil or criminal, the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *DeHass, supra*, at paragraph one of the syllabus. . . .

We also find that after viewing the evidence in a light most favorable to the State, a rational trier of fact could find the essential elements of the crime proven beyond a reasonable doubt. Therefore, the murder conviction is supported by sufficient evidence. The fourth assignment of error is overruled.

*State v. Sowell*, 2008 WL 2600222, at *17-19. Again, this Court conducts its review under the standard set forth in 28 U.S.C. § 2254(d), (e).[5]

---

[5]

Petitioner refers to a Judge Whiteside's dissenting opinion concluding that the trial court had abused its discretion in admitting excerpts of telephone calls into evidence, and that such error was not harmless, in support of his claim that the evidence was constitutionally insufficient to sustain his conviction. Judge Whiteside argued in relevant part as follows:

The sole issue was the identity of the perpetrator of the crime, and the evidence against appellant was entirely circumstantial and far short of compelling. Fares, one of appellee's two principal witnesses, described the man who shot Jones as having a "very obvious" full beard, i.e., one that was two to three inches long around his entire face, and wearing a green shirt with a yellow image on it. However, Crump, appellee's other key witness, testified that in the ten years he had known appellant, he had never seen him with a full beard; in addition, he did not testify that appellant had a beard on the night in question. Moreover, appellee did not submit any evidence establishing that appellant was wearing, or even owned, a green shirt like the one described by Fares. In addition, despite the fact that Fares paid at least "some attention" to and came "face-to-face" with the shooter for a "reasonable period of time," he could not identify appellant as the shooter from either of the photo arrays. Indeed, Fares averred that the shooter did not even resemble any of the photographs in either of the arrays.

Crump also testified that appellant was only one of a number of people with whom he spoke when he stopped across the street from the carryout. Crump did not know where appellant went after their conversation and did not witness the shooting. Indeed, Crump was already a few blocks away when he heard the gunshots.

Further, to the extent that Crump's testimony could be used to establish that appellant was the person with whom he spoke across from the carryout and who later, according to Fares, entered the carryout, we note that Crump had substantial credibility problems. Crump admitted that on the night in question he was high from smoking marijuana. He further admitted that after the police told him he and his cousin were both implicated in the crime, he told the police what he thought they wanted to hear. Indeed, he averred he adopted the description of appellant provided by the police. He further admitted he never told the police of Little C's presence in the SUV.

Finally, no physical evidence connected appellant to the murder or even the crime scene. Police never linked appellant to the gun utilized to kill Jones, and Crump testified that he did not see appellant with a gun. No fingerprints, DNA, or other forensic evidence tied appellant to the scene.

In the final analysis, the evidence against appellant was not so overwhelming that the trial court's error in admitting the recordings of appellant's jail calls was much less harmless beyond a reasonable doubt. The trial court's error denied appellant his constitutional right to due process and a fair trial. Accordingly, appellant is entitled to a new trial. The third assignment of error should be sustained.

*State v. Sowell,* 2008 WL 2600222, at *22 (Whiteside, J., dissenting).

there must be evidence sufficient to justify a reasonable trier of fact to find guilt beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319 (1979). To determine whether the evidence was sufficient to support a conviction, this Court must view the evidence in the light most favorable to the prosecution. *Wright v. West*, 505 U.S. 277, 296 (1992) (citing *Jackson,* at 319.) The prosecution is not affirmatively required to "rule out every hypothesis except that of guilt." *Id.* (quoting *Jackson,* at 326). "[A] reviewing court 'faced with a record that supports conflicting inferences must presume-even if it does not appear on the record-that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.' " *Id.* (quoting *Jackson*, at 326).

Federal habeas courts must afford a "double layer" of deference to state court determinations about the sufficiency of the evidence to sustain a conviction. As explained in *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009), deference is due to the jury's finding of guilt because the standard, announced in *Jackson v. Virginia,* is whether "viewing the trial testimony and exhibits in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Even if a *de novo* review of the evidence leads to the conclusion that no rational trier of fact could have so found, a federal habeas court "must still defer to the state appellate court's sufficiency determination as long as it is not unreasonable." *See also White v. Steele*, 602 F.3d 707, 710 (6th Cir. 2009). This is a substantial hurdle for a habeas corpus petitioner to overcome. In this case, Petitioner has not done so here.

"[C]ircumstantial evidence alone is sufficient to sustain a conviction and such evidence need not remove every reasonable hypothesis except that of guilt." *United States v. Kelley*, 461 F.3d 817, 825 (6th Cir. 2006). For the reasons detailed by the state appellate court, this Court agrees that, when viewing all of the evidence in the light most favorable to the prosecution, the evidence was

constitutionally sufficient to sustain Petitioner's conviction.

Claim four is without merit.

**WHEREUPON,** the Magistrate Judge **RECOMMENDS** that this action be **DISMISSED.**

## PROCEDURE ON OBJECTIONS

If any party objects to this *Report and Recommendation*, that party may, within fourteen (14) days of the date of this report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions.  28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to object to the *Report and Recommendation* will result in a waiver of the right to have the district judge review the *Report and Recommendation* de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the *Report and Recommendation. See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

The parties are further advised that, if they intend to file an appeal of any adverse decision, they may submit arguments in any objections filed, regarding whether a certificate of appealability should issue.


**DATE:**          **October 14, 2011**                         **/s/  *Elizabeth A. Preston Deavers***
                                                      **ELIZABETH A. PRESTON DEAVERS**
                                                      **UNITED STATES MAGISTRATE JUDGE**